MILWAUKEE COUNTY, Appellant, vs. CITY OF HURLEY, Respondent.

*February 15—March 14, 1944.*

For the appellant there was a brief by *James J. Kerwin,* district attorney of Milwaukee county, *O. L. O'Boyle,* corporation counsel, and *Robert P. Russell,* assistant corporation counsel, and oral argument by *Mr. F. C. T. John,* special assistant corporation counsel.

For the respondent there was a brief by *J. E. Flandrena,* acting district attorney of Iron county, and *R. C. Trembath* of Hurley, and oral argument by *Mr. Trembath.*

MARTIN, J.   Vincent Severini was born in Hurley, Wisconsin, June 8, 1912.   He lived with his father in Hurley until September, 1933.   He was incarcerated in the Green Bay state reformatory on September 28, 1933, and released on March 26, 1935.   He then went to Milwaukee where his mother had

been living since some time in 1926. He also had a sister who lived in Milwaukee. His father left Hurley for El Paso some time between September 18, 1933, and September 21, 1934. Vincent Severini worked in Milwaukee from March, 1935, to August, 1935, selling papers, and lived with his sister while in Milwaukee.

In August, 1935, he enrolled in the CCC and was sent to a CCC camp at Phillips, Wisconsin. He designated his mother, Catherine Basso, his allotee. His CCC employment was as follows:

| | |
|---|---|
| 8/1935 to 11/35 | Phillips, Wisconsin—CCC |
| 11/35 to 12/31/35 | Fort Sheridan—CCC |
| 12/31/35 to 1/4/36 | Independence, Wisconsin—CCC |
| 1/4/36 to 7/2/36 | Durand, Wisconsin—CCC |

Vincent was married at Durand, Wisconsin, May 28, 1936. He was dishonorably discharged from the Durand CCC camp July 2, 1936. From July 22 to August 22, 1936, he worked on Highway 10 for Pepin county. From October 13 to December 13, 1936, he worked for the city of Durand. On June 30, 1936, he made application for WPA employment at the PWD office at Durand. Certification for eligibility for WPA was sent in on September 1, 1936, by Pepin county welfare department. He applied for relief in the city of Durand September 9, 1936, and signed a nonresident affidavit on said date stating that his home was in Milwaukee. He received relief from the city of Durand from October, 1936, to February 12, 1937, intermittently. From February 12 to May 1, 1937, he was at Durand without relief, and from May 1 to May 30, 1937, at Eau Galle, Dunn county, Wisconsin, without relief. He moved to Milwaukee May 30, 1937, and has since resided in that city. He at no time returned to Hurley since his release from the state reformatory.

On the foregoing agreed facts the single question on this appeal is whether or not Severini lost the legal settlement

which he had in the city of Hurley at the time he entered the CCC camp. Defendant city contends that the CCC employment did not prevent Severini from losing his legal settlement in said city by one year's absence. This contention is also based on the admitted fact that Severini, from and after the time he was released from the state reformatory, did not intend to claim nor did he intend to have the city of Hurley as his place of residence. If Severini's CCC employment prevented his loss of legal settlement in the city of Hurley then Milwaukee county was entitled to recover the sum of $827.88 from the city of Hurley.

The question here involved depends upon whether employment in CCC camps constitutes pauper support. The Civilian Conservation Corps was established by presidential order under the provisions of an act of congress approved March 31, 1932, 48 U. S. Stats. at L. 22. The corps was originally known as "Emergency Conservation Corps." In 1937 the name was changed to "Civilian Conservation Corps." The act was entitled: "An act for the relief of unemployment through the performance of useful public works, and for other purposes." It provided:

"That for the purpose of relieving the acute condition of widespread distress and unemployment now existing in the United States, and in order to provide for the restoration of the country's depleted natural resources and the advancement of an orderly program of useful public works, the President is authorized, under such rules and regulations as he may prescribe and by utilizing such existing departments or agencies as he may designate, to provide for employing citizens of the United States who are unemployed, in the construction, maintenance and carrying on of works of a public nature in connection with the forestation of lands belonging to the United States or to the several states. . . ."

On April 5, 1933, the President of the United States, by executive order, appointed Robert Fechner director of emer-

gency conservation work. The executive authority with respect to emergency conservation work was extended and additional funds provided by the Emergency Relief Appropriation Act of 1935 (Pub. Res., No. 11, 74 Cong. 1st Sess., Approved April 8, 1935), 49 U. S. Stats. at L. 115. This joint resolution of the congress is entitled: "Joint resolution making appropriations for relief purposes," and provided as follows:

"That in order to provide relief, work relief and to increase employment by providing for useful projects, there is hereby appropriated, out of any money in the treasury not otherwise appropriated, to be used in the discretion and under the direction of the President, to be immediately available and to remain available until June 30, 1937, the sum of $4,000,000,000. . . . This appropriation shall be available for the following classes of projects, and the amount to be used for each class shall not, except as hereinafter provided, exceed the respective amounts stated, namely: . . . (f) Civilian Conservation Corps, $600,000,000. . . . The authority of the President under the provisions of the act entitled 'An act for the relief of unemployment through the performance of useful public work, and for other purposes,' approved March 31, 1933, as amended, is hereby continued to and including March 31, 1937. . . ."

The selection of men for the Civilian Conservation Corps during the years 1935 and 1936 was made by local selecting agents designated by the state agency pursuant to quotas established by the United States department of labor. The local selecting agencies usually served at the same time as local public-welfare, relief, or works authorities. (Pages 10 to 12, Handbook for Agencies Selecting Men for the CCC, Bul. No. 3, Ed. July 1, 1935.) The minimum eligibility requirements as established by the director and the department of labor were: (Page 5, Handbook for Agencies Selecting Men for the CCC.)

*"Minimum eligibility requirements.* An applicant for enrollment as a junior must be: Between 18 and 28 years of

age, unmarried, unemployed, physically fit, a citizen of the United States, with needy dependents of blood or obligation, and willing to allot a substantial portion of the $30 minimum monthly cash allowance to a dependent beneficiary. In order to clear the public-relief rolls, the applicant must definitely represent a family receiving relief."

The reason for limiting selection to men with dependents is stated to be: (Page 6, Handbook.)

"Selections are limited to young men who have dependents and who want to help them; selections do not include unattached, homeless, transient men, because the required allotments can be used more productively if these funds benefit whole families rather than single individuals. The work is reserved for men representing families on the relief rolls in order to provide employment for those in greatest need."

The selecting agencies were advised with respect to dependents and allotments as follows: (Page 7, Handbook.)

*"Dependents*—Dependents must be in needy financial circumstances and on the relief rolls. They may be dependents either of blood or obligation. For example, a young man who has been living with an unrelated family for some years and who is considered a member of the family and feels an obligation to contribute to its support may in the discretion of the selecting agency be considered eligible.

"The state or local selecting agency may use its discretion as to the selection of men who are residents of the state but who have dependents in another state. Assuming that the existence of needy dependents can be verified, if the man is selected he is counted as one of the quota of the state which selects him; there can be no transfers of quotas between states for this purpose.

*"Allotments*—Only those who are willing to make allotments are eligible. The applicant's desire to make an allotment must be a voluntary one, however.

"Experience has indicated that most men will want to allot $25 per month. This will ordinarily be satisfactory as the man will not need more and should not have much less than

$5 a month in cash at camp for incidental expenses. There is, of course, a manifest advantage in the management of camp life when all those enrolled are on the same (or nearly the same) basis so far as spending money is concerned.

"The selecting agency may in its discretion give preference to a man who wishes to allot $25 against a man who wishes to allot a smaller amount."

While it appears that Severini made application for WPA employment at Durand on June 30, 1936, there is no reference in the agreed statement of facts to indicate that he was ever so employed by the WPA. The WPA was created under the Emergency Relief Act of 1933 (48 U. S. Stats. at L. 55–58). That act provided:

"The congress hereby declares that the present economic depression has created a serious emergency, due to widespread unemployment and increasing inadequacy of state and local relief funds, resulting in the existing or threatened deprivation of a considerable number of families and individuals of the necessities of life, and making it imperative that the federal government co-operate more effectively with the several states and territories and the District of Columbia in furnishing relief to their needy and distressed people."

This is in marked contrast to the language and purpose of the act under which the CCC was formed. The latter act was for the purpose of relieving "distress and unemployment now existing in the United States, and in order to provide for the restoration of the country's depleted natural resources and the advancement of an orderly program of useful public works, the President is authorized, under such rules and regulations as he may prescribe, . . . to provide for employing citizens of the United States who are unemployed, in the construction, maintenance and carrying on of works of a public nature in connection with the forestation of lands belonging to the United States or to the several states. . . ."

The CCC program furnished the thousands of young men who enrolled in its organization food, clothing, shelter, medical

attention in camp during their term, plus a cash allowance of $30 a month. In view of the purpose and objects sought to be attained under the CCC administration, it cannot be said that Severini's employment in the CCC camps from August, 1935, to July, 1936, constituted pauper support. There is not even a basis for an inference from the facts that Severini, at the time he enrolled in the CCC, was not able to provide for his own livelihood.

To provide for the restoration of the country's depleted natural resources, coupled with a program of useful public works, and providing for employing citizens who were unemployed, in the construction, maintenance, and carrying on of works of a public nature in connection with the forestation of lands belonging to the federal government or to the several states is not a mere relief project. We think it would come as a great shock to the thousands of young men who were employed in the CCC camps to learn that their employment constituted pauper support.

CCC and WPA employment were on separate and distinct bases. Under the WPA program employees had to be found public indigents in actual need and placed on the relief rolls before they were eligible for WPA work. A CCC worker did not have to be placed on the relief rolls. There is nothing in the statement of facts or in the stated methods of selecting men for the CCC to show that Severini was ever placed on the relief rolls of Milwaukee county. At the time of his enrollment in August, 1935, he was an adult and lived with his sister in the city of Milwaukee. He made his mother his allotee when he joined the CCC. She evidently was the needy dependent.

Appellant cites the case of *Madison v. Dane County,* 236 Wis. 145, 294 N. W. 544, to sustain its contention that while Severini was enrolled in the CCC he was being supported as a pauper. The facts in that case are clearly distinguishable from the agreed facts in the instant case. In *Madison v. Dane*

*County, supra,* the family in question was supported by the WPA earnings of the father, supplemented by direct relief; and, as heretofore stated, all WPA employees had to be found public indigents in actual need and placed on the relief rolls before they were eligible for WPA work. A CCC worker did not have to be placed on the relief rolls. So far as the facts disclose, Severini received relief from the city of Durand intermittently from October, 1936, to February 12, 1937, at which time he signed a nonresident affidavit to the effect that his home was in Milwaukee.

Appellant also cites sec. 6, ch 363, Laws of 1933, to sustain its contention that CCC work constitutes work relief. The applicable part of said section provides that "relief shall include . . . wages paid in cash or in kind for public work provided to *dependent* persons where the amounts paid are determined upon the basis of actual need." There is nothing in the record to show that Severini was a dependent person at the time he joined the CCC.

We are obliged to hold that while Severini was enrolled in the CCC he was not being supported as a pauper. Such employment did not prevent him from losing legal settlement in the city of Hurley. Having lost his legal settlement in that city, the complaint must be dismissed.

*By the Court.*—Order affirmed.